**1813.**

D'ARCY *against* LYLE.

*Philadelphia,*
*Monday,*
March 29.

THIS was an action of *indebitatus assumpsit*, in which the plaintiff declared for money paid laid out and expended, money lent and advanced, money had and received, and work, labour, and services. It was tried before *Yeates* J. at a *Nisi Prius* in *December* last, when a verdict was found for the plaintiff, damages 3500 dollars; and upon a motion by the defendant for a new trial, his honour reported the facts to be as follows:

*Damages ii red by an ag without his o fault, in the management of the principal's affairs, or in consequence of such management, must be borne by the principal. Hence, where A, the agent of B, recovered certain covered certain*

On the 4th of *August* 1804, the plaintiff, who was then about to proceed to *Cape Francois* upon commercial business, received from the defendant a power of attorney to demand from *Suckley* and *Co.* at the *Cape*, who had been the defendant's agents, all his goods remaining unsold in their hands, and to settle by compromise or in any manner the plaintiff thought most beneficial, all accounts of the defendant with that house. On the voyage, the plaintiff, in consequence of being chased by a *French* privateer, threw overboard, among other papers, the power of attorney. He stated this fact to *Suckley* and *Co.* upon his arrival, who consented to deliver up the goods, upon his promising to pay a balance which they alleged to be due from the defendant; and this being assented to by the plaintiff, they proceeded to deliver the goods. Before the delivery was complete, one *Thomas Richardson* attached them with other goods of *Suckley* and *Co.*, to secure a debt due by them to the house of *Knipping* and *Steinmetz* of *Charleston*, for whom he was agent. The plaintiff interposed a claim on behalf of the defendant; and on the 26th of *November* 1804, the Chamber of Justice decreed that he should retain possession of the merchandize, on his entering into a recognisance in the sum of 2089 dollars, conditioned to produce within four months an authentic letter of attorney from the defendant, or on default to pay *Richardson* as the agent of the *Charleston* house, the said amount, which was the invoice value of the merchandize. The recognisance was given on

*of B's goods in Cape Francois, by the decree of a competent court there, (the same having been attached by C for the debt of D and Co. in whose hands they were, and claimed in court by A) and then sold them and remitted the proceeds to B; and was afterwards in a suit instituted by C, and connected with the first proceeding, compelled by the threats of the president Christophe, to confess, contrary to the truth, that at the time of receiving the goods, he promised to pay C a sum of money on account of D and Co., and to let judgment go against him, It was held, that A might recover from B his principal the amount*

thus paid, it not exceeding the estimated value of *B*'s goods

the 30th of *November*; and on the 6th of *December* follow. the plaintiff personally appeared in the clerk's office of the Civil Tribunal where it was entered, and caused an act to be made, setting forth, that his recognisance or submission in *November* should be null, as he had received the power of attorney, and notified it to *Richardson*. In *November* 1805, the plaintiff having sold the goods, forwarded an account current to the defendant, making the nett balance 2509 dollars 60 cents. On the 1st of *December* 1805, he by letter directed the defendant to pay over to a friend all his funds, after deducting the balance due to himself; and on the 19th of *April* 1806, having had some misunderstanding with the defendant, he wrote his final letter, closing his correspondence, and declining any further concern with him. Up to this time *Dessalines* was emperor, and favoured the plaintiff.

In *March* 1808, the powers of government at the *Cape* being in *Christophe*, who was the friend of *Richardson*, and the plaintiff continuing to reside as a merchant at the *Cape*, *Richardson* instituted a suit against the plaintiff in the Tribunal of Commerce, to recover from him the value of the goods, which by the decision of the Chamber of Justice had been decreed to him as the defendant's agent in 1804. The amount of the claim was 3000 dollars, which by a memorial presented by the plaintiff to the tribunal, (no part of the record of this court being produced) appeared to be founded on an alleged promise of the plaintiff to pay so much for *Suckley*; but in the memorial the plaintiff denied the promise, asserted that this was no other than the transaction about the security to produce a power of attorney, that he was no longer an agent for *Lyle*, and had settled the matter with him, and that *Richardson* was endeavouring to make them change the just and wise decision made more than three years before. On the 14th of *May* the Tribunal of Commerce gave judgment for *D'Arcy*. *Richardson* appealed to the Civil Tribunal of the first district of the province of the North, sitting at the *Cape*. That court on the 1st of *June* confirmed the sentence of the lower court. *Richardson* had previously applied to the president *Christophe*, who interfered in the proceedings, and on the 31st of *May* sent an order for the imprisonment of *D'Arcy's* lawyer, who was tied and sent to the fort. To this another order succeeded, that *D'Arcy* and *Richardson* should fight each other, and that

the issue of the combat should be fatal to one or the other. **1813.**
A friend of *D'Arcy* waited upon *Christophe*, remonstrated
against the order, and procured the commander of a *British*
vessel of war then in the harbour, to do the same; but the **LYLE.**
president insisted upon the combat, unless *D'Arcy* would
pay to *Richardson* the sum claimed as the value of the goods.
*D'Arcy* having determined not to pay the money, the parties
met, but neither of them was injured. On the same day
another order came from *Christophe*, that *D'Arcy* and *Rich-
ardson* should again fight at six o'clock on the following
morning, and that he, *Christophe*, would be there himself to
see the affair settled. The friends of *D'Arcy*, deeming it
dangerous for him to remain longer at the *Cape*, prevailed
upon *him* to attempt his escape; but he was intercepted by
the president's order. The same friends then advised him
to pay the money, and preserve his own life, that of his
lawyer and the judges, all of whom were in danger from
the parts they had taken. The plaintiff still refused. About
dusk of the same evening *Christophe* sent for *D'Arcy*, and
had a conversation with him, the purport of which was not
in evidence; but on the next day, after the judgment of the
lower court had been confirmed, *D'Arcy* in open court re-
tracted his defence, consented that both judgments should
be reversed, that his memorial should be burnt by the pub-
lic agent, and that he should be condemned to pay *Richard-
son* the 3000 dollars he claimed, and the costs. He retract-
ed his oath also, that he owed *Richardson* nothing, because,
as the record of the court set forth, *Richardson* had since
made him remember some facts his memory did not furnish
him when he took the oath. The court accordingly reversed
the judgments, condemned *D'Arcy* to pay *Richardson* the
3000 dollars, " for so much he had engaged to pay him for
" *Suckley* and *Co.*, for merchandize which the latter had de-
" livered to him as belonging to Mr. *James Lyle*, whom
" the said *D'Arcy* represented, for which the tribunal, do
" reserve to Mr. *D'Arcy* his rights, that he may prosecute
" the same if he thinks proper against *Lyle* or *Suckley*." On
the 22d of *June*, *D'Arcy* paid the 3000 dollars and the costs.

Judge *Yeates* charged the jury, that if they were satisfied
the plaintiff individually promised to pay *Richardson* the

In the right margin: **D'ARCY**, *v.*

3000 dollars, he could not recover. But the record shewed, that there was a review of the suit in 1804, respecting the goods of the defendant received from *Suckley* and *Co.*, as the judgment referred the plaintiff to the defendant for compensation. The plaintiff was in no fault; he stood out until the safety of all concerned in the business was endangered. He did not pay voluntarily. The jury must decide whether the loss arose from his private engagement, or from his having received the goods as agent of the defendant. If they were satisfied that the money was extorted from the plaintiff as the defendant's agent, he might recover under the count for money paid to the defendant's use. A loss of money incurred by the agent without fault, ought to be compensated by the principal.

The motion for a new trial was argued at *December* term last.

*Tod* and *Rawle* for the defendant, argued, that there should be a new trial, because, 1. The defendant was in no manner bound to answer for the loss incurred by the plaintiff. 2. There was no count upon which, if a recovery was just, the plaintiff could recover what the jury had given him. 3. The verdict was excessive.

1. The agency of the plaintiff for the defendant ceased in the year 1805. He remained in *St. Domingo* after that time, for his own business; voluntarily exposing himself to the tyranny and outrages of the black government, and finding an indemnity for this exposure in his own emoluments. The loss which accrued in 1808, was therefore not incurred in the course of the agency, but was the effect of an outrage committed upon his property intentionally detained within the reach of the wrongdoer, to which the defendant was in no respect accessary. Take it first upon the ground of a promise actually made by the plaintiff when he received our goods, to pay *Richardson* 3000 dollars on account of the debt due by *Suckley* and *Co.* It was a promise never communicated to or sanctioned by the defendant, and which most obviously transcended the agent's powers; for the amount to be paid, was greater than the value of the goods, and not a shadow of authority was given to make any contract with *Richardson* on behalf of the *Charleston* house. *Nixon* v.

*Hyserott* (*a*). But this promise was a fiction. The transaction with *Suckley* and *Richardson* closed with the production of the power of attorney. The suit in 1808 was instituted under the patronage of *Christophe*, not as an appeal from or review of the prior suit, for in none of the proceedings in 1808 is the decree or judgment of 1804 either reversed or questioned, but as a new action, depending for its success upon despotic authority, regardless alike of law and morality. Take the case then upon the ground not of promise, but of an outrage committed under the coercion of despotism, it is a qualified robbery of the plaintiff's own property, for which he can have no recourse to us, without destroying commercial security, and putting every merchant in this country who has ever employed as his agent a resident in *St. Domingo*, at the mercy of the despots who rule that island. The consequences of such a doctrine may be terrible. An agency has closed, or expired. The agent is no longer in the confidence or employ of his former principal. His former principal is dead, and his property is distributed. A suit is commenced against the agent in *Algiers*, in *Turkey*, or at the *Cape*, and under the threat or the asserted threat of death, he is made falsely to acknowledge a promise, upon a matter said to be connected with his former agency, and to confess a judgment to an extent beyond all that his principal was worth. Is it possible to say that such an agent can recover his loss from the principal, without destroying hereafter that relation among men? It is not our property that has been taken; it is not in the course of an agency for us, that his own property has been taken; it is the case of an extorted promise under at most a mere colour of continuing agency, the whole from the foundation a tissue of falsehood and outrage, and the judicial proceedings the mere machinery of robbery. All writers upon the subject of mandatary contracts, agree that in such a case there is no recourse to the principal. The mandant is obliged to replace to the mandatary, all reasonable expenses disbursed *bona fide*, and the damage sustained by him *in the execution* of the mandate. 2 *Ersk. Inst. Bk.* 3. *sec.* 38. *p.* 534. The agent ought to be repaid whatever charges he has been at in the execu-

1813.
———
D'ARCY
*v.*
LYLE.

(*a*) 5 *Johns*. 58.

tion of the commission; and the same holds good of any loss that happens *by reason of the trust*, but not of such a loss as is occasioned *obliquely* by it, as if he had been plundered or shipwrecked. *Puff. lib. 5. cap. 4. sec. 4. p. 482.* When an agent undertakes a hazardous business, as every business in *St. Domingo* is to an *American* merchant, he takes the risks on himself. *Ibid.* If he suffers damage on account of the affair which he has taken in hand, we must judge by the circumstances, on whom the loss must fall. It will depend on the quality of the order to be executed, the danger, the nature of the event which occasioned the loss, *the connexion between the event and the order that was executed*, the relation which the thing lost or the damage sustained, had to the affair which was the occasion of it. 1 *Domat. Bk.* 1. *Tit.* 15. *sec.* 2. *art.* 6. If a person undertake to go for another to a place where his own business obliges him to take money with him, and he is robbed of it, the person who engaged him to make the journey is not liable for the loss. *Ibid. note to art.* 6. The agent may be a sufferer in his own person or property by the business he undertakes, as where one goes a journey and lames his horse, or is hurt himself by a fall on the road; but he cannot recover unless by express stipulation. 1 *Paley's Mor. Ph.* 175, *Bk.* 3. *ch.* 12. He may demand reparation for such losses only as are the *natural consequence* of his agency. *Burl. pt.* 3. *ch.* 12. *sec.* 2. 1 *Hub.* 367. *Non omnia quæ impensurus non fuit, mandator imputabit, veluti quòd spoliatus sit à latronibus, aut naufragio res amiserit, vel languore suo, suorumque adprehensus, quædam erogaverit; nam hæc magis casibus, quàm mandato imputari oportet. Dig. lib.* 17. *Tit.* 1. *sec.* 26. *art.* 6. The distinction is then between those losses which grow naturally out of the agency, and such as are casual, or as *Puffendorf* terms them, *oblique*, not flowing directly from the execution of the mandate. For the latter, which is the character of the plaintiff's loss, the defendant is not liable. There is also a strong equitable reason why in the present case, he should not be; for although he may recover from *Richardson*, we cannot from either *Richardson* or *Suckley*.

2. The only count on which he can recover, is the equitable count for money had and received; but we have never received with interest more than 2000 dollars; the nett pro-

ceeds of the goods, deducting the balance paid to *Suckley*       **1818.**
and *Co.*, and the outstanding debts, being but 1627 dollars.   ———————
· 3. Upon the same ground the damages are excessive.             D'ARCY
                                                                 *v.*
                                                                 LYLE.

*Hare* and *Tilghman* contra. The authorities cited for the
defendant on the important question in this cause, will not
be controverted. They prove by the clearest implication,
that a loss growing out of the agency, without the fault of the
agent, is to be borne by the principal. The rule is distinctly
stated and illustrated by *Heineccius.* The person giving a com-
mission, is obliged to restore useful and necessary charges,
and bound to repair all damages that may have been incurred
for his sake, or on account of managing his affairs, without
the fault of the agent. 1 *Turnb. Heineccius* 269. *lib.* 1. *cap.*
13. *sec.* 349. The same principle runs through a variety of
cases, in which the relation of the parties is analogous to
that of principal and factor. If a trustee is robbed of the
trust-money, he is entitled to an allowance. 2 *Fonbl.* 177. If
a partner who is travelling on business of the concern, is
wounded or robbed, the common stock must make it good.
1 *Domat.* 159. *lib.* 1. *tit.* 8. *sec.* 4. *art.* 12., 2 *Ersk. Inst.* 528.
*Puff.* 279. *bk.* 5. *ch.* 8, *note by Barbeyrac.* Partners are agents
for each other; and they derive their indemnity under such
circumstances, from their acting at the time as agents for
their house. It is the plainest equity, and the merest justice,
that the agent should be indemnified; and if ruin must follow,
it is better that it should fall upon him who was to reap the
profit, without being personally exposed to the injury.

Consider this case then either as a regular judicial pro-
ceeding, founded on a real promise, or as an act of force
springing from despotic power; in either point of view, the
defendant is answerable. If a real promise, the plaintiff had
authority to make it, for he was empowered to settle the ac-
count with *Suckley* and *Co.* by compromise, or in any other
way, and of course to promise, as a means of obtaining un-
disturbed possession of the goods, to pay their debt to *Rich-
ardson's* friends at *Charleston.* Setting aside the idea of a
promise, then it is most clear, that the final act of force was
applied in a suit growing out of, and connected with, the
original proceeding. The jury have negatived all individual
liability by the plaintiff to *Richardson,* and therefore we

1813.

D'ARCY
v.
LYLE.

must take the asserted liability to have been as agent. This is the first step. The next feature in the case, is *Richardson's* intention by the suit to defeat, if not reverse, the judgment in 1804. The records are imperfect. The situation of the country prevents perfect copies from being obtained. But enough appears in the plaintiff's memorial or defence, to shew the connexion, because he says that it was *Richardson's* endeavour to make the judges " change their already wise and just " decision," and " who could suppose that the repose of so " honourable a decision should be disturbed after the lapse of " more than three years." If the money had not been paid over by the plaintiff to the defendant, it would have been impossible for the latter to recover, against this proceeding at *Hayti;* and where is the difference between the inability to recover, and the obligation to refund? Where would be the difference between *Christophe's* seizing the goods in the hands of the plaintiff, and compelling him to pay money on account of those goods after they were sold? If an agent advances money to the principal, and the goods are burnt:—or after the agent has sold and accounted for the goods, a suit is brought against him by third persons claiming the property, and obtaining a judgment:—or while the goods are in his hands, a suit against him for them is decided in his favour, he then sells and remits, and upon appeal the first judgment is reversed, and judgment rendered against the defendant:— what difference is there between any of these cases, and the present, in which the first judgment was in fact reversed, in a proceeding which was intended to have that effect? In one and all the agent is entitled to an indemnity. It is true the act of *Christophe* was an outrage of the grossest kind. But we are not to criticise such acts by the rules of our own code; it is enough that the plaintiff did not yield a voluntary assent to it, that he resisted until resistance was fruitless, and certain death the consequence of continuing it; and that it was a consequence flowing from the agency, and which could not have existed but for the agency. It is said the plaintiff was not agent at the time. This is begging the question. He was agent *quoad hoc,* if the second proceeding grew out of the first; and it is of no importance whether actual agent or not, if the loss was the consequence of the agency. The material fact is, that *Richardson's* claim did not originate in a transaction subsequent to the agency. It is also objected that

the plaintiff continued to reside at the *Cape*, after the agency ceased, and that it was his own property that was exposed. To make this of any consequence, it must have been a *fault* in him to remain there: he was under no obligation to remove. It is said too that this loss was the result of one of the risks attending the agency, which he knew and took upon himself. In no respect does it deserve the name of a casualty. It was a consequence of the agency, produced by the will of those among whom the commission was to be executed. Finally it is objected that we can recover against *Richardson*, and the defendant cannot. This also begs the main question. If we paid as agent, and paid for the defendant, he may recover, and not we. But it is no reason for turning us round, be the law as it may.

2. The action may be supported upon either of the counts. We have recovered no more than the principal, interest and expenses, and this was the least we were entitled to. 2 *Com. on Contr.* 1. 138. 159.

3. For the same reason the damages are not excessive.

*Cur. adv. vult.*

Tilghman C. J. after stating the facts, and remarking that although the records were very imperfect, he thought it sufficiently appeared that the proceedings in 1808, were connected with those of 1804, either as an appeal from the judgment in 1804, or a revival of the suit in a new form, proceeded as follows:

This is one of those extraordinary cases arising out of the extraordinary situation into which the world has been thrown by the French revolution.

If the confession of judgment by the plaintiff had been *voluntary*, it would have lain on him to show that the 3000 dollars were justly due from the defendant to *Richardson*, or the persons for whom he acted, or that they had a lien on the goods of the defendant to that amount. But the confession of judgment was *beyond all doubt* extorted from the plaintiff by duress, and he did not yield to fears of which a man of reasonable firmness need be ashamed. The material fact on which this case turns is, whether the transactions between the plaintiff and *Richardson*, were on any *private* account of the plaintiff, or solely on account of the defendant. That was submitted to the jury, and we must now take for

1813.

D'ARCY
v.
LYLE.

granted that the proceedings at the *Cape* against the plaintiff, were in consequence of his having received possession of the defendant's goods, from *Suckley* and *Co.* I take the law to be as laid down by *Heineccius, Turnbull's Heinec. c.* 13. *p.* 269, 270, and by *Erskine* in his *Institutes,* 2 *Ersk. Inst.* 534, that damages incurred by the agent in the course of the management of the principal's affairs, or in consequence of such management, are to be borne by the principal. It is objected that at the time when judgment was rendered against the plaintiff, he was no longer an agent, having long before made up his accounts, and transmitted the balance to the defendant. But this objection has no weight, if the judgment was but the consummation of the proceedings which were commenced during the agency. As such I view them, and I make no doubt but they were so considered by the jury. It is objected again, that no man is safe if he is to be responsible to an unknown amount, for any sums which his agent may consent to pay, in consequence of threats of unprincipled tyrants in foreign countries. Extreme cases may be supposed, which it will be time enough to decide when they occur. I beg it to be understood, that I give no opinion on a case where an agent should consent to pay a sum, far exceeding the amount of the property in his hands. That is not the present case, for the property of the defendant, in the hands of the plaintiff in 1804, was estimated at 3000 dollars. The cases cited by the defendant show, that if the agent on a journey on business of his principal, is robbed of *his own money*, the principal is not answerable. I agree to it, because the carrying of his own money was not necessarily connected with the business of his principal. So if he receives a wound, the principal is not bound to pay the expenses of his cure, because it is a personal risk which the agent takes upon himself. One of the defendant's cases was, that where the agent's horse was taken lame, the principal was not answerable. That I think would depend upon the *agreement of the parties.* If *A* undertakes, for a certain sum, to carry a letter for *B*, to a certain place, *A* must find his own horse, and *B* is not answerable for any injury which may befall the horse in the course of the journey. But if *B* is to find the horse, he is responsible for the damage. In the case before us, the plaintiff has suffered damage without his own fault, *on account of his agency*, and the jury have indemnified him to an amount,

very little if at all exceeding the property in his hands, with interest and costs. I am of opinion, that the verdict should not be set aside.

Yeates J. Several legal exceptions against the plaintiff's recovery in this suit, were taken by the defendant's counsel in the course of the trial, which have been relinquished upon the argument on the motion for a new trial. It is now contended that the payment made by *D'Arcy* to *Thomas Richardson*, was voluntary, and unconnected with the agency under Mr. *Lyle*, and that were it otherwise, the defendant as principal, is not responsible to the plaintiff for injuries done by a *despot* to him as a special agent, after the determination of his authority.

The cause was put to the jury to decide, whether the conduct of the plaintiff as agent of the defendant was correct, and whether the payment of the 3000 dollars under the sentence of the Court of *Hayti*, was extorted under colour of law from him for acts done by him during his agency. The jurors by their verdict, have established the affirmative of both questions, and I was far from being dissatisfied therewith: I feel no diposition to disturb their decision.

I see no reason whatever for retracting the opinion I had formed on the trial, that where a factor has acted faithfully and prudently within the scope of his authority, he is entitled to protection from his constituent, and compensation for compulsory payments exacted against him under the form of law, for the transactions of his agency. The flagitious conduct of *Christophe*, President of *Hayti*, compelled the litigant parties under his savage power, into a trial by battle, in order to decide their civil rights. He influenced the civil tribunal of the first district of the province of the North, sitting at the *Cape*, " to set aside a former judgment rendered " by the tribunal of commerce, and of their own Court, and " to condemn *D'Arcy*," according to the language of the sentence, " to pay to *Thomas Richardson* 3000 dollars, for so " much he had engaged to him to pay for *Suckley* and *Co.* " *for merchandize, which the latter had delivered to him as* " *belonging to James Lyle*, whom the said *D'Arcy* repre- " sented, for which the tribunal *do reserve to D'Arcy his* " *rights*, that he may prosecute the same, if he thinks proper, " *ag inst the said Lyle* or *Suckley*," &c.

1813.

D'ARCY
v.
LYLE.

The defendant appointed the plaintiff his attorney, to settle and collect a debt in a ·barbarous foreign country. The plaintiff has transacted that business with fidelity and care, and remitted the proceeds to his principal. He risked his life in defence of the interests of his constituent, under the imperious mandate of a capricious tyrant, holding the reins of government. He has since been compelled by a mockery of justice, to pay his own monies for acts lawfully done in the · faithful discharge of his duties as an agent; and I have no difficulty in saying, that of two innocent persons, the principal and not the agent should sustain the loss.

In *Leate* v. *Turkey Company Merchants*, *Toth.* 105, it was decreed, that if a consul beyond sea hath power, and do levy goods upon a private merchant, the company must bear the loss, *if the factor could not prevent the act of the consul.* The decree is founded in the highest justice, and its reason peculiarly applies to the present case. *D'Arcy* was doomed by the cruel order of an inexorable tyrant, either to pay the 3000 dollars, or in his hated presence to fight his antagonist until one of them should fall.

Upon the whole, I am of opinion that the motion for the new trial be denied.

BRACKENRIDGE J. Whatever conditional stipulation it might have been necessary for *D'Arcy*, the agent of *Lyle*, to have made, provided that stipulation was not so much against the interest of *Lyle*, as to come under the denomination of an unreasonable stipulation, and to constitute a mal-agency respecting the subject of the agency, *Lyle* the principal, must have been bound by it. The giving bond to produce the power of attorney, in order to receive the goods of *Lyle*, out of the hands of *Suckley*, which would seem to have been detained under the claim of *Richardson*, might be deemed prudent; and had the power of attorney not have been produced, owing to no fault of *D'Arcy*, but to accident, or the impossibility of getting it in time, *Lyle* might be considered as bound to pay the bond, as the goods had been disposed of for his benefit. But the power of attorney was received, and the bond satisfied; and we hear no more of this. It is on an entire new ground, that a claim was advanced by *Richardson* against *D'Arcy* as the agent of *Lyle*. It is that of an agreement or stipulation by him, (*D'Arcy*) that in consideration

of having obtained a delivery of the goods of *Lyle*, he would pay the debt due by *Suckley*, and in whose possession the goods of *Lyle* were, a debt due and owing from *Suckley* to him (*Richardson*) as agent for a house in *Charleston*. Had he made such agreement, and it should turn out that this debt was beyond the value of the goods received for the use of *Lyle*, it would be an unfaithful, being an improvident agency; and he would not be considered as entitled to recover from *Lyle*, more than the value of the goods which he had received, and the money arising from the sale of which had come to the hands of *Lyle*. But *D'Arcy* admits that he had made no such agreement, or stipulation whatever, on behalf of *Lyle*, in order to receive his goods, or to have them delivered to him. How then can he claim against *Lyle?*

It is alleged to be on the ground, that *Richardson* had compelled him from a fear of life to acknowledge such agreement. It was on the allegation of *Richardson*, that *Christophe*, the master of the gang, interfered, and compelled *D'Arcy* to acknowledge such agreement. He compelled him to come into a court of his, who had given judgment to the contrary, and confess such agreement; in other words, to retract a denial of such agreement, and give his court colour for reversing the judgment before given. This cannot be distinguished from a compulsion *without colour*, to retract a denial, and confess an agreement. It is the same thing as if *Richardson* and *Christophe*, out of doors, had compelled through a fear of life *D'Arcy*, not only to pay money, but to acknowledge that he had agreed to pay it. A common carrier has carried the money of *B*, to pay *C*. He is met by a gentlemanly footpad, who says that the money is his so carrying to *C*. It is denied by *A*, who is suffered to go on. But on his return, he is again accosted by the same footpad, who alleges that he agreed to pay him that sum or a greater, on condition that he should be suffered to go on and carry to *C*. It is denied, but the master of the gang interposes, and says he shall acknowledge the agreement. The acknowledging the agreement never made, is but the *sub modo* of the robbery. It is but the robbery of the carrier, under a pretence of having carried the money of *B*, which he the footpad alleges, belonged to him, and which he the carrier had agreed on his first journey to be the fact, and now on his return should pay him, and even a greater sum. In this case, it would

appear to be as perfectly a pretence, as that of the wolf in the fable, accusing the lamb of disturbing the stream. Why is it that a carrier must be answerable for goods notwithstanding a robbery? It is the policy of the law, founded on the possibility of a carrier procuring himself to be robbed. Will not the same policy be in the way of an agent recovering for an alleged robbery; robbed more especially not of the goods in his possession, but of other goods, on account of having had these? Settling such a principle, would render it unsafe to have an agent at all. There are two things or circumstances which take this case entirely out of all reason and justice; the remaining in the country after the agency as to the principal had been closed, and it being the act of the agent himself that gave colour to the compulsion. He was put in fear, fear of his life; a fear that would excuse or justify a constant and resolute man; that is clear. But it is his misfortune, and I can consider *Lyle* under no obligation to indemnify him for the loss. His redress, if he shall ever be able to obtain any, must be against the spoiler, or those for whom he may have acted, or who may have obtained the advantage of his wrong. There is a third circumstance in this verdict, which would justify a new trial; the sum given being beyond the value of the goods or money, even with interest, which *D'Arcy* the agent alleges to have been paid, on account of obtaining possession of the property of *Lyle*. But on the two first grounds, I do not think him entitled to recover. I see nothing of an appeal from a proceeding under a claim made or interposed against the goods of *Lyle*. Nor am I able to see any thing like a growing out of the claim; it may be said to be engrafted on it, or adscititious to it, or springing up with it. But the act of *D'Arcy* himself, confessing an agreement, is the only thing that can connect; and this he admits did not exist. His agency for *Lyle*, might be said to be the occasion, but could not be considered the cause of his loss. But it was rather the occasion of the pretence that was set up, and to which *D'Arcy* himself gave sanction, and if he has saved his life by that, he must keep his life as that for which he sustained the loss. It is not more nor less, than if an agent having resisted a claim, set up against his *quondam* principal, and to avoid a challenge, should come into one of our courts, and move to have the judgment in his favour set aside, and to confess a judgment against his

principal, which if allowed, might be to any amount. It is a question with moralists, whether it is lawful for the sake of life or property to depart from truth.

1813.

D'ARCY
v.
LYLE.

· *Propter vitam, vivendi perdere causas.*

Where a person had a right to expect the truth, it is not *lawful*, however under circumstances it may be *excusable.* But for one to evade a risk by departing from the truth, and to attempt to throw the loss upon another person, is totally inadmissible; it cannot be done. If any argument could be drawn from the circumstance of the master of the gang, *Christophe*, being a principal as to the force, it must be evident that it might be owing to the indiscreet expressions respecting *Christophe*, and his influence upon the administration of justice in his courts, that induced him to interpose. This was the act of *Richardson*. I am therefore of opinion for the defendant.

New trial refused.