## John C. Greene & others *vs.* Nathaniel Goddard.

H., the agent, in Boston, of W. & Co., bankers in London, gave this letter of credit : " I hereby authorize R. & Co. to value on W. & Co. at six months' sight, at Canton, for the account of G. of Boston, for any sums not exceeding £6000 sterling; and I hereby engage, as the authorized agent of W. & Co., that the bills of R. & Co. shall be duly honored, when presented, if drawn within twelve months from the date of this letter : " G. at the same time engaged to remit to W. & Co., in London, funds sufficient to meet the payment of all bills drawn by virtue of the said letter of credit . G. transmitted this letter to R. & Co., at Canton, and requested them to draw bills, pursuant to said letter, to dispose of the bills, and to invest the proceeds in merchandize on G.'s account, and ship it to him in the United States : R. & Co. drew bills accordingly, on W. & Co., and with the proceeds thereof purchased merchandize and forwarded it to G., which he received and accepted : W. & Co. accepted the bills, but failed in business, before the bills fell due : F., one of the firm of R. & Co., resident in Boston, on hearing of the failure of W. & Co., made an arrangement with B & Co. of London, to take up these bills, at maturity, (and other like bills, to a much larger amount, drawn by R. & Co. on W. & Co., and by them accepted,) for the honor of R. & Co., the drawers; and B. & Co. accordingly took them up, supra protest. By this arrangement with B. & Co., F. was to send funds to them ; and B. & Co. were to make advances for R. & Co. on merchandize by them before consigned to B. & Co. for sale, and were to hold the merchandize as security for such advances : F. remitted bills of exchange to B. & Co., which he purchased at a premium of twenty one per cent., which was then the rate of exchange between the United States and London, but was less than would have been the damages, if the bills drawn by R. & Co. had been returned to them at Canton : The bills thus purchased were remitted, at different times, to meet the bills drawn by R. & Co. on W. & Co., as they might fall due, and not especially for the payment of the bills drawn on G.'s account : G. did not remit funds to W. & Co. to meet the payment of these bills at maturity ; but he afterwards sent funds to them, with which W. & Co. took up those bills, by paying to B. & Co. the amount thereof, with interest, bankers' commissions and notarial charges : R. & Co. afterwards brought an action against G. to recover damages sustained by them, *first*, in paying a premium on their remittances to B. & Co., and *secondly*, in the loss arising from their not being able to draw against the merchandize in the hands of B. & Co., which was held by them as security for their advances towards taking up bills for the plaintiffs' honor. *Held*, that G., by requesting R. & Co to draw said bills, undertook and was liable to indemnify them for so doing ; that this liability was not extinguished or affected by G.'s furnishing funds to W. & Co., and by their payment to B. & Co. of the bills, with interest and charges ; that R. & Co. had a legal right to protect their credit, by causing the bills to be paid supra protest for their honor, without waiting for a return of the bills to them at Canton ; and that the loss, arising from the premium paid for remittances, should be assessed equally and ratably upon all the bills paid for R. & Co. by B. & Co. ; but that G. was not liable to R. & Co. for any loss arising from their not being able to draw against their merchandize in the hands of B. & Co.

This was an action of assumpsit to recover damages for a breach of a contract alleged to have been made by the defendant with the plaintiffs, as implied by law, on the facts

hereinafter stated. At the trial before *Hubbard*, J. the evidence introduced by the parties showed, in substance, the following facts :

On the 1st of March 1836, Messrs. T. Wiggin & Co., of the city of London in England, bankers, by their duly authorized agent, Robert Hooper, jr., at Boston, granted to the defendant a letter of credit, of which the following is a copy: " Boston, March 1, 1836. I hereby authorize Messrs. Russell & Co. to value on Messrs. T. Wiggin & Co., London, at six months' sight, at Canton, for the account of Nathaniel Goddard, Esq. of Boston, for any sums not exceeding in all four thousand pounds sterling. And I hereby engage, as the authorized agent of Messrs. T. Wiggin & Co., that the bills of Messrs. Russell & Co. shall be duly honored when presented, if drawn within twelve months from the date of this letter. Robt. Hooper, jr. Attorney to T. Wiggin & Co."

The defendant, at the same time, signed the contract with the said T. Wiggin & Co., of which the following is a copy. " Boston, March 1, 1836. Mr. Robert Hooper, jr., on behalf of Messrs. T. Wiggin & Co. of London, having at this date opened a credit on said T. Wiggin & Co. for my account, to be used in Canton by Russell & Co. to the extent of four thousand pounds sterling, in consideration thereof I hereby agree to remit to. T. Wiggin & Co., in London, sufficient funds to meet the payment of all bills which may be drawn by virtue of this credit, together with all charges on the same. I further agree with said T. Wiggin & Co. to give security here, to the satisfaction of their agent, to the amount of four thousand pounds sterling, at any time when required by them or their agent. Nathaniel Goddard."

On the 18th of March 1836, the said T. Wiggin & Co., by their said agent, at Boston, granted to the defendant another letter of credit for two thousand pounds sterling ; and the defendant, at the same time, signed a contract with the said T. Wiggin & Co. This second letter and second contract were like the first letter and first contract, above set forth, in all particulars except the sum therein mentioned.

The  plaintiffs,  at  the  dates  of  these  letters  of  credit,  were
commission  merchants,  having  a  house  of  trade  at  Canton,  in
China,  one  of  the  partners  whereof. then  and  always  resided  in
the  United  States,  for  the  purpose  of  attending  to  the  business
of  the  house,  which  consisted  chiefly  of  commission  business
transacted  in  China  for  merchants  in  the  United  States.

On  or  about  the  date  of  the  last  of  said  letters  of  credit,
the  defendant  sent  both  of  said  letters  to  the  plaintiffs  at
Canton,  requesting  them  to  draw  bills  of  exchange,  pursuant  to
said  letters,  to  dispose  of  the  bills  of  exchange,  and  to  invest
the  proceeds  in  merchandize  for  the  defendant's  account,  and
send  it  to  him  in  the  United  States.     The  plaintiffs  received
these  instructions,  at  Canton,  and,  pursuant  thereto,  they  drew
on  T.  Wiggin  &  Co.,  eight  bills,  each  for  £500  sterling,  on
the  16th  of  August  1836,  one  bill  for  £500  sterling,  and
another  for  £1500  sterling,  on  the  6th  of  October  1836.
These  bills  were  all  payable  in  six  months  after  sight,  being
the  usual  time  on  which  bills,  drawn  in  China  on  English
bankers,  are  made  payable ;  and  they  were  sold  by  the  plain-
tiffs  in  Canton,  and  went  through  India  to  England (as  is  the
usual  course  of  bills  drawn  in  China,)  and  were  presented  to
and  accepted  by the  drawees,  in  London,  between  the  2d  of
March  and  the  22d  of  April,  1837.     The  plaintiffs,  with  the
proceeds  of  these  bills,  purchased  the  merchandize  (silks  and
teas)  which  the  defendant  had  ordered,  and  sent  it  to  him
in  the  United  States,  together  with  the  regular  and  usual
accounts  of  their  doings  in  the  premises ;  and  the  defend-
ant  accepted  and  received  the  said  merchandize  to  his  own
use.

On  the  3d  of  June  1837,  while  all  the  said  bills  were  run-
ning  towards  maturity,  Wiggin  &  Co.,  the  acceptors,  failed  and
stopped  payment.     Notice  of  their  failure  reached  Boston  on
the  27th  of  said  June,  and  on  that  or  the  next  day, this  notice
was  received  by  J.  M.  Forbes,  one  of  the  plaintiffs,  then  residing
in  Boston.     On  the  29th  of  July  1837,  Mr.  Forbes,  on  behalf
of  his  house,  addressed  the  following  letter  to  the  defendant :
"Nathaniel  Goddard,  Esq.,  sir :  I  learn  that  bills  drawn  by

Russell & Co. of Canton, on Messrs. Timo. Wiggin & Co. London, for your account, become due as follows:

2 for £500 and 500 — 1000 on the 5th September next,
2 for 500 and 500 — 1000 " 28th " "
1 for 500 — 500 " 2d October "
1 for — 1500 " 17th " "
4 for 500 each — 2000 " 25th " "

in all for £6000, six thousand pounds sterling.

" Will you be so good as to inform me whether you have taken the necessary steps to meet these bills? And if not, what measures you are prepared to adopt in order to protect the drawers from the consequences of their non-payment at maturity? And oblige your obedient servant, J. M. Forbes, of the house of Russell & Co."

To this letter the defendant replied as follows:

" Boston, July 31st, 1837. J. M. Forbes, Esq. Sir: Your favor of the 29th current is before me, in which you state " [quoting the contents of Mr. Forbes's letter.] " In reply, I am happy to state that I have taken such measures as appear to me sufficient to prevent any bills, drawn for my account, from going back to the drawers. Nathaniel Goddard."

Mr. Forbes, in order to prevent the said bills, and other bills drawn by the plaintiffs, from going back to the drawers at Canton, purchased bills of exchange and sent them to Baring, Brothers & Co. The plaintiffs had, at the same time, a large credit with Baring, Brothers & Co., on account of merchandize which the plaintiffs had previously consigned to them; and they accordingly requested Baring, Brothers & Co. to make use of the proceeds of said bills, sent to them as aforesaid, and of said credit on account of said merchandize, to protect the bills drawn by the plaintiffs, by paying them at maturity, for the honor of the drawers. (See the facts, as to these bills and as to the credit on the plaintiffs' merchandize, more particularly stated in the opinion of the court, *post.* 230.)

The said Forbes was obliged to pay for the said bills, sent to Baring, Brothers & Co., as aforesaid, a premium of 21 per

cent. on the par of exchange ; that being the current rate of exchange between this country and England, at the time when said bills were purchased and remitted ; and bills drawn by said Forbes, in behalf of his said house, on Baring, Brothers & Co. against the said credit on account of the said merchandize, might have been sold by him, at the same time, for the same premium.

All the bills drawn by the plaintiffs on account of the defendant, as aforesaid, were paid at maturity, supra protest, by Baring, Brothers & Co., for the honor of the drawers, under the arrangement made by the said Forbes, as aforesaid.

On the 19th of October 1837, Mr. Forbes, in behalf of his said house, addressed to the defendant the following letter : " Boston, 19th Oct. 1837.  Nathaniel Goddard, Esq.  Sir : I have to inform you that Messrs. Baring, Brothers & Co. have paid, for the honor of the drawers, two bills of exchange drawn by Russell & Co., Canton, 16th Aug. 1836, on your account, upon Messrs. Timo. Wiggin & Co.

|  |  |  |  |  |
|---|---|---|---|---|
| £500 . . . | £1000 | 00 | 0 |
| with notarial charges . . . . | 4 | 14 | 0 |
| postage . . . . . . . . | 0 | 9 | 6 |
| commission 1 per cent. . . . | 10 | 0 | 0 |
|  | £1015 | 3 | 6 |

" Paid 6th September 1837, to meet the above amount with two months' interest at 5 per cent. per annum. . . . . . . . . . . .   8  11  6

£1023  15  0

" I paid, on or before the 6th of August, for a 60 day bill on London, remitted per packet of 8th of August, at a premium of 21 per cent., £5505·5·3, for which sum, with interest since the 6th of August, I will thank you to reimburse me at your earliest convenience.  I remain, sir, respectfully,

"Your obedient serv't. J. M. Forbes, of R. & Co."

To this letter the defendant made a reply on the 23d of October 1837, which contained the following passages : " Yours of the 19th was duly received.  I notice particularly its contents, and am very sorry it was not in my power

promptly to take up the bills from Messrs. Russell & Co. of Canton. I attempted, and thought I should succeed in making an arrangement, to take up every bill that was used for my benefit; but I failed in this." " I must now say, I cannot be punctual, but will do every thing possible for me to do, to make payment in England, where I expect to, and am preparing to, meet the bills and discharge them as fast as possible. I am making and shall continue to make shipments of cotton, &c. for the purpose of meeting all my debts there. I hope, when I discharge all that Messrs. Baring, Brothers & Co. take up, with their commission, interest, and cost of protest, that all parties will be satisfied. I repeat, I cannot be punctual, but your debt is as safe ultimately, as if in gold in the bank. I will do every thing I can, even at a great sacrifice, to meet it as soon as possible. Yours very respectfully,
Nathaniel Goddard."

On the 7th of November 1837, Mr. Forbes, in behalf of his house, addressed a letter to the defendant, as follows: "Your favor of 23d October is received. In reply, I beg to assure you that it is far from my wish, or that of my partner now here, that you should sacrifice property unnecessarily to satisfy our claim, and that, placing full reliance upon your disposition to repay us promptly, we are content to await your convenience. We think, however, the principle on which our claim was made was a just one, viz. reimbursement for the amount actually paid on your account here. I trust that you will view the matter in the same light, and I shall be obliged to you by your giving me some acknowledgment of the debt payable here. In addition to the amount already advised, I have received protests of £1000 on your account paid 3d October, with charges, £15·6·6, which please note. Your obedient servant, J. M. Forbes."

To this letter the defendant replied thus: " Boston, November 8th, 1837. J. M. Forbes, Esq. Sir: I am happy to find you do not feel desirous that I should sacrifice property unnecessarily to meet bills drawn for my account." " As I before stated, I have been making arrangements to meet all

bills made for my account in England, and shall do it as fast as possible, but cannot be punctual.   I will do all I can.   It was in England that these bills were intended to be paid.   ·I have therefore, acted in conformity.   You are ultimately perfectly safe, let the steps you take be what they may.   Yours very respectfully,                          Nathaniel Goddard."

On the 21st of March 1838, Mr. Forbes, in behalf of his said house, addressed the following letter to the defendant : " Sir : My partner, Mr. Coolidge, is on the point of embarking for London, which I hope will prove my apology for asking of you some information as to your arrangements for paying the amount which we have taken up of bills on Messrs. Wiggin & Co. for your account ; by giving which, you will oblige, sir, your obedient servant.   J. M. Forbes, of the firm of Russell & Co."

The defendant's reply was thus : " Boston, 22d March, 1838. J. M. Forbes, Esq.   Dear sir : I received your note of yesterday, inquiring what arrangements I have made for taking up the dishonored bills on Mr. Wiggin & Co.   By particular request of Mr. Wiggin & Co., and in order, I suppose, to facilitate his resuming his usual business again, I have agreed to remit direct to him to pay *pro rata* on all I owe in England, of every description, being about £12,000.   Not much, as yet, has reached him ; but arrangement for considerable is on the way, and I confidently hope that the whole will be, in the course of ninety days, and sooner, if possible.   Very respectfully yours,                          Nathaniel Goddard."

The result of the defendant's arrangements was such, that through T. Wiggin & Co., he repaid to Baring, Brothers & Co., on account of the plaintiffs, the same amount of pounds sterling, as the plaintiffs had paid in London on account of the bills drawn by the plaintiffs on the defendant's account, as aforesaid, together with interest and notarial charges of protest ; and the bills were given up to Wiggin & Co.   These payments to Baring, Brothers & Co. were made in the sums, and at the dates following : June 9th 1838 — £1276·6·3. April 21st 1838 — £1200.   July 13th 1838 — £3817·16 0.

The plaintiffs, through Mr. Forbes, received notice, in Boston, of the first of these payments, on or about the 20th of July 1838, when the premium of exchange between this country and England was nine per cent. They received notice as aforesaid, of the second of these payments, on or about the 31st of May, 1838, when the premium of said exchange was 7 3-4 per cent. They received notice, as aforesaid, of the third of said payments, on or about the 5th of August 1838, when the premium of said exchange was 8 per cent. And at there several rates of exchange the plaintiffs might have drawn for those several sums, at Boston, or elsewhere in the United States.

If the bills, drawn by the plaintiffs on account of the defendant, as aforesaid, had gone back to the drawers at Canton, where the usual rate of interest is twelve per cent., this, together with the reëxchange and damages, would have caused a loss of more than 21 per cent. on the pound sterling, reckoned at four dollars and forty four cents of the currency of the United States.

Some other facts, not above stated, were also given in evidence, which are referred to in the opinion of the court.

The case was, by consent, withdrawn from the jury, and submitted to the court, who were to draw all inferences of fact, as a jury might; and the parties agreed that if the law warrants a recovery by the plaintiffs, and the evidence is sufficient as to damages, the case should be referred to an assessor to ascertain, on such principles as the court might direct, the amount of damages to be recovered, and that judgment should be entered for the plaintiffs, accordingly; otherwise, that judgment should be entered for the defendant.

*B. R. Curtis*, for the plaintiffs.

*Bartlett*, for the defendant.

HUBBARD, J. As the defendant's name does not appear on the bills of exchange drawn by the plaintiffs upon Messrs. T Wiggin & Co., he cannot be liable for any damages arising to the plaintiffs in consequence of the non-payment of the bills by the acceptors, unless upon some separate agreement existing between him and the plaintiffs. If the plaintiffs

were merely vendors of goods to the defendant, and took the written authority of the agent of Wiggin & Co. to draw on them for £6000, in payment therefor, then they have no claim on the defendant; but their remedy, if they have any, can only be against Wiggin & Co., who authorized them to draw the bills. The first inquiry, therefore, which presents itself is, what was the relation which existed between the plaintiffs and defendant in regard to the transactions out of which the present suit has arisen ; whether the plaintiffs were merchants acting on their own account, or agents of the defendant, and transacting business on his account.

The agreement of Wiggin & Co., of March 1st 1836, in consequence of which the bills were drawn, was made by their agent, Hooper, with the defendant, in Boston ; and it contained an authority for the plaintiffs (Russell & Co.) to draw bills of exchange at Canton, at six months' sight, on T. Wiggin & Co., London, for account of the defendant; which bills, so drawn by the plaintiffs, the agent of Wiggin & Co. engaged should be duly honored, if drawn within twelve months from the date of the letter. In consideration of this credit thus opened for his account, to be used in Canton, by the plaintiffs, the defendant agreed to remit to Wiggin & Co. sufficient funds to meet the payment of all bills which might be drawn by virtue of that credit, and to give security for the amount, to the satisfaction of Hooper, the agent, at any time when required. This credit was enclosed in a letter to the plaintiffs, bearing the same date with the credit ; and the letter states that the credit is remitted to them to be used for his account, and that he wishes the plaintiffs to invest the proceeds in silks and teas, or in such articles as their judgment shall dictate as suitable for the Boston market, and at the lowest rate of freight they can contract for in a first rate vessel. This letter was received by the plaintiffs, and in consequence of it, they negotiated the exchange in the months of August and October 1836, the net proceeds of which, after deducting their commissions, they credited to the defendant, and charged him with an invoice of silks and teas, in October, and which they shipped to his address.

These transactions do not disclose a sale of the credit to the plaintiffs, and a purchase of goods of them in payment, and thus leaving the plaintiffs to dispose of the bills for their own account; but the plaintiffs, by this letter and their acts under it, were constituted and became the agents of the defendant for the disposition of the exchange for his use and benefit, and for the purchase of goods for his account. The letter is an authority to sell the bills for his account, and to invest the proceeds in goods for him. He thus constitutes them his agents, for this purpose, and they accept the appointment; and he is the principal in the transaction. And though their services are compensated by a commission, yet their relations with the defendant do not cease by the mere disposing of the bills and the purchase of the goods. If bills had been drawn by the defendant, and rendered negotiable by the names of others as payees and indorsers, and the plaintiffs were not required, in the negotiation, to put their names upon the bills, the agency would have been determined on the disposing of the drafts, and the purchasing and shipping of the goods, with the necessary accounts and documents. But the credit of Wiggin & Co. did not contain an authority for the defendant to draw the bills; but the plaintiffs alone could draw them. In sending the credit, then, to the plaintiffs, to be used by them, the defendant, in fact, requested them to draw the bills in their own names, but to negotiate them on his account; and consequently the drawing of the bills by the plaintiffs was for the benefit and at the risk of the defendant. Their names were given for his use and benefit, and, as between themselves and the defendant, as his agents. He therefore became responsible to the plaintiffs to protect them, as the drawers of the bills for him, from all losses by reason of so drawing, not proceeding from their own negligence or default. To the parties who should take the bills, they became responsible as the drawers, if the drawees should fail to accept, or refuse to pay them, not only for the face of the bills, but for the damages arising from their non-acceptance or non-payment. And though they might perhaps have a

19 *

claim on Wiggin & Co. for not accepting the bills, or not paying them, if accepted, still they were not confined to that quarter for relief, but had a right to look to their employer and principal for indemnity. Where an agent, in pursuing the instructions of his principal, and acting within the scope of his authority, becomes personally liable for the performance of the contract he makes for his principal, and without which personal liability the orders of the principal cannot be executed at all, or not so well executed, and this is known by the principal at the time of giving his instructions and creating the agency, if a loss occur to the agent, it is most clear that he can look to the principal for indemnity for the damage sustained by him. And this rests upon those sound principles of common sense and mutual justice in the transaction of business, upon which the law merchant, in its various branches, is founded; and which law, as it regulates and prescribes the rights and duties of principal and agent, alike furnishes protection to the agent, when he suffers loss through fidelity to his employer, and gives redress to the principal who sustains an injury from the breach of orders or neglect of duty by the agent. In *Ramsay* v. *Gardner*, 11 Johns. 439, the plaintiff indorsed a bill drawn by the defendant. The indorsement was made by the plaintiff, as agent for the defendant. The bill was returned, and the plaintiff, as indorser, paid it, with the postages, protests and twenty per cent. damages. He brought his action to recover the sums so paid; and the court held that as he had acted as the agent of the defendant, and without benefit to himself, the money which he had paid was paid for his principal, and that he was entitled to recover. So in *Stocking* v. *Sage*, 1 Connect. 522, the court held that an agent, who, in acting faithfully for his principal, is subjected to expense, is to be reimbursed; and that if he is sued on a contract made pursuant to his authority, the law implies a promise by the principal to indemnify him. So in *D'Arcy* v. *Lyle*, 5 Binn. 441, the court approved the doctrine of the civil law, that where damages are incurred by an agent, in the management of the business of his principal, or in conse

quence of it, the principal is responsible to him for the damages so incurred. See also *Powell* v. *Trustees of Newburgh*, 19 Johns. 284. *Child* v. *Morley*, 8 T. R. 610. So in *Riggs* v. *Lindsay*, 7 Cranch, 500, where Riggs gave an order to Lindsay to purchase, for his account, a quantity of salt, and to draw, as directed, for payment, and the drawees refused to accept the bills which Lindsay drew, and he, in consequence of the non-acceptance, was obliged to take them up and pay damages thereon; it was held to be a payment of the debt of Riggs, who gave the order, and that there was no good reason for distinguishing between the damages and the principal sum.

This, then, is a case of principal and agent; and the agents allege, that in the faithful discharge of their duty, they have sustained a direct loss, as well through the failure of the acceptors of the bills to pay them at maturity, as through the neglect of the defendant to place funds in the hands of the acceptors, to provide for their payment, agreeably to his promise. Owing to the revulsions in the mercantile world, an event happened, alike unexpected to both parties, namely, the suspension of the great American agency houses in London, through whose credit a vast amount of business was originated and transacted, and by whose stoppage both the plaintiffs and the defendant were deeply affected. The plaintiffs, as a great commission house in China, had purchased goods to a very large amount on the faith of letters of credit furnished by the London houses, and had paid for them, by passing their bills on said houses; and the defendant was one of those for whose use some of those bills were drawn, in payment for goods purchased. All the bills, in the present instance, reached London, before the suspension of Wiggin & Co., and were all accepted; but the suspension took place, on the 2d or 3d of June 1837, before any of them matured The correspondents of the plaintiffs, in London, fortunately for them, were the house of Baring, Brothers & Co., who had strength to resist the current which swept away their neighbors; and they, immediately after, to wit, on the 5th of

June, wrote to the plaintiffs' house at Canton, and to J. M. Forbes, a member of the house, then in Boston, that they would interfere for the honor of the Canton house, and would protect the bills drawn by them, and should, in the mean time, retain the goods in their hands, consigned to them by the plaintiffs, or the proceeds, when sold, for their security, and should rely on Mr. Forbes to procure the parties in America, for whose account the bills were drawn, to make remittances to meet them, as they arrived at maturity, or upon Forbes himself, to supply them with funds. The bills drawn for account of the defendant fell due at different times, and the first matured on or about the 5th of September 1837. On the 29th of July 1837, Forbes informed the defendant when all the bills would fall due, and inquired of him whether he had taken the necessary steps to meet the bills drawn by Russell & Co. for his account, and if not, what measures he was prepared to adopt to protect the drawers from the consequence of their non-payment ; to which the defendant replied that he was happy to state that he had taken such measures as appeared to him sufficient to prevent any bills, drawn for his account, from going back to the drawers. But it turned out that the defendant did not furnish funds to provide for the bills at maturity, and they were left, therefore, to be provided for by the drawers or to be returned to Canton.

In October 1837, after Forbes had received information that the first two bills had been taken up by Baring, Brothers & Co. he informed the defendant of the fact, and that he himself had previously purchased bills on London, at a premium of twenty one per cent. and had remitted an account of the bills drawn for the defendant, and requested a reimbursement. To this the defendant replied, that he was sorry that it had been out of his power promptly to take up the bills of Russell & Co. of Canton, as he had expected ; that he was preparing to make payment in London, as fast as possible, and to discharge all that Baring, Brothers & Co. should take up, with their commission, interest and costs of protest, so that all parties might be satisfied ; but making no allusion to dam-

ages on the bills, a reimbursement for which had been claimed by Forbes; not meaning, probably, to commit himself on that subject. The residue of the correspondence, and of the transactions of these parties, is not of a nature to change the legal relations between them.

On examining the testimony in the case, it is apparent that the bills were taken up by Baring, Brothers & Co. as they came to maturity, for the honor of the drawers, and that Forbes furnished funds for their reimbursement, by direct remittances from Boston, in part, and by certain transfers to their credit, on the books of Baring, Brothers & Co., the origin of which transfers is not distinctly stated; but the accounts apparently show that when all the bills drawn by the plaintiffs for account of the defendant, to the amount of £6000, were paid by Baring, Brothers & Co., they had received from Russell & Co. (the plaintiffs) about £4000 towards their reimbursement.

It is proved, then, by the evidence in the case, that the plaintiffs, in consequence of the neglect of the defendant to provide for the bills drawn for his account, at their maturity, have sustained a loss, to make good which they allege they have a legal claim upon the defendant. The defendant avers, on his part, that this claim, if it ever existed, has been extinguished, and if not, that the plaintiffs have not placed themselves in such a situation as to give them a claim against him for damages for not providing for the bills as they matured.

The ground upon which the defendant relies, to show that this claim of the plaintiffs is extinguished, rests upon the following facts, as proved in the case: That the defendant, from time to time, after the bills matured, remitted funds to Wiggin & Co. to pay the same, and that they, by means of those remittances, paid, in the months of April and June 1838, to Baring, Brothers & Co., about £2400 sterling of the bills; and in the month of July following, partly from further remittances from the defendant, and partly from their own funds, they paid the balance of £3600, together with the interest and expenses thereon, and the bankers' commission of one per

cent., as is usual in such cases ; and that on such final pay-ment in July, Baring, Brothers & Co. gave up the bills tc Wiggin & Co., without any claim for damages. This pay ment and surrender of the bills, the defendant contends, werè either a waiver of any claim which had been previously made on him for damages, or an extinguishment of such claim, on the ground that the agents of the plaintiffs settled the whole demand arising upon the bills, and relinquished this claim, and that, as agents, they were authorized so to do ; and that Wiggin & Co., as the agents of the defendant, made this set-tlement for him.

If the plaintiffs' claim upon the defendant for damages was founded upon the bills themselves, and the production of them on the trial was necessary to support their claim, as in the common case of an indorsee in a suit against an indorser or the drawer, the defence would be well sustained. But, in the first place, the acceptors supra protest had not only a right to look to the drawers for reimbursement, but also to call upon the other parties to the bill, upon whom the drawers might call for payment, who, in this case, were the acceptors, and consequently they were authorized (not to say bound) to call upon Wiggin & Co. for payment for their own account ; but, as between the acceptors supra protest and the original ac-ceptors, the question of damages did not arise, they may also be considered as agents for the plaintiffs, in calling upon Wig-gin & Co. for payment, because the defendant had stated to the plaintiffs his intention to pay the bills in London, through Wiggin & Co., and the plaintiffs had so instructed Baring, Brothers & Co., as may well be inferred from the facts in the case. But the claim of the plaintiffs upon the defendant does not rest on the ground that the defendant is a party to the bills and to be treated in the same manner as an indorser, but upon the fact that the plaintiffs, in the due execution of their agency for the defendant, have sustained a loss for which he is bound to reimburse them; and that a payment of the face of the bills and the interest and expenses, and a banker's com-mission, is only a partial indemnity, and does not make good

their loss.    The settlement, so made with Wiggin & Co., we do not consider as a waiver or extinguishment of the plaintiffs' claim.

The defendant denies that there was any original agreement on his part with the plaintiffs, or any consideration for the contract now attempted to be enforced, and that such bills are drawn every day, on the faith of a letter of credit, without reference to the party who agrees to make the banker good for his letter of credit.   But, as we have before held, the sending of the letter of credit to the plaintiffs, with a request to them to use it for his account, in the manner directed, and their accepting the commission, do constitute an agreement between the parties, as principal and agent, and the rights and duties belonging to such relation are created between them ; and the drawing of the bills in their own name, thus making themselves responsible as drawers, is a good consideration for the claim of indemnity now attempted to be enforced.   And whether bills of this description are drawn without reference to the party who contracts with the banker on whom they are drawn, (as it was said in argument,) must depend on the particular facts in each case, which cannot be developed unless a loss takes place.

But it is contended, that if the defendant was ever liable for damages, it could only be for those damages which would arise upon the return of the bills to Canton, and the payment of damages there by the drawers, and that, in this case, the drawers having interfered for their own benefit, before any of the bills came to maturity, to prevent their return, and having provided funds, from this country or in London, for their payment, they were acting without reference to the defendant, and that he did not become party to such arrangement, and is not to be in any way affected by it.   The reasoning of the counsel for the defendant, on this part of the case, was ingenious, but we cannot admit its correctness.   If the relations of the plaintiffs and defendant had been only those which subsist between the parties to a bill of exchange, we should have given more weight to the argument, that the bills

must be returned upon the parties, and the damages paid in regular course, before the claim could have been enforced; though we are not inclined to yield to its correctness. But these are not the relations of these parties. They are those of an agent seeking to recover an indemnity from his principal, for a loss sustained by him in the faithful discharge of his agency As drawers of the bills, the plaintiffs had a right to prevent their return to India and China, upon their being dishonored by the acceptors, and to make reasonable arrangements, in anticipation of the event of such dishonor, to prevent them from being returned. This is a privilege incident to the relation of every drawer or indorser of a bill; and the right arises from the duty imposed on every merchant to sustain his mercantile credit, and to avoid the payment of heavy damages, which are always consequent upon the return of a bill to a distant country. In the present case, no advantage could by possibility arise to any party from the return of the bills; for the indorsers in India, if called upon, would look to the drawers, and the drawers must make good the loss, by placing the amount claimed of them in London, or by paying, at their place of domicil, its full equivalent. The drawers, then, did, by their agents, Baring, Brothers & Co., in London, what the acceptors were, or, on their default, what the defendant was bound to do. They took up the bills in London, at maturity, and thus prevented great injury to themselves and others.

The plaintiffs were not required, in the execution of their agency for the defendant, in drawing the bills, to provide funds for their payment; and the partner of the house, who was then in Boston, was fully justified in providing those funds; and unless the expense of doing it exceeded what the damages would have amounted to, if the bills had been returned to and paid in Canton, the defendant has neither cause nor right to complain.

Whether the defendant made an agreement, or not, with Mr. Forbes, in regard to remittances, or ratified his acts in remitting to meet these and other bills, (which the defendant denies,) it

s not necessary, we think, for us to determine ; because the claim of the plaintiffs does not rest upon any further contract or new consideration, but upon the original undertaking, implied by law, to protect the plaintiffs from loss in consequence of drawing these bills for his account. It is said that the defendant should not be bound by an agreement made two months before any bill fell due, and when he was making arrangements to pay them at maturity. That is true ; and if he had so paid the bills, no claim would have existed against him. The claim arises, not from the executory agreement with Baring, Brothers & Co., but from the actual damage sustained by the plaintiffs in providing funds for these bills, which they were compelled to do, in consequence of the defendant's neglect.

It is said that it may justly be inferred from the testimony both of Mr. Wiggin and Mr. Bates, that the bills would not have gone back to China, if the arrangement had not been made by Mr. Forbes. How this might have been, we cannot now determine. But such a supposition or belief, if it existed even at the time, would not have deprived Mr. Forbes of the right of preventing the bills from going back, or establishing the credit of his house upon stronger foundations than the mere lenity of creditors, or their apprehension that they might possibly suffer more by returning their bills than by retaining them. They protected themselves as drawers, which they had a perfect right to do, and the defendant has no legal or equitable ground of complaint against them for doing it. His ratification of the act is not necessary to entitle the plaintiffs to recover.

We are now brought to the consideration of the question, what damages have the plaintiffs sustained, for which they have a legal claim on the defendant, who has paid the face of the bills, and interest, and the common expenses of protest ? Two grounds of claim are made by the plaintiffs; the one for the premiums paid on remittances to London to meet these with other bills; and the other from the loss arising from not drawing against the goods in the hands of Baring, Brothers

& Co., and which was not done, because the same were held by the consignees as security for their reimbursement on taking up the bills.

The house of Russell & Co. had not only drawn bills on the faith of the credit sent to them by the defendant, but also to a large amount upon similar credits furnished to other persons, and for whom a like business was transacted; so that, at the time of the stoppage of the agency houses, they had about £50,000 of bills outstanding, all of which required pro tection, and, so far as Mr. Forbes knew, other bills might also be on their way. At the same time, they had large consignments of goods in the hands of Baring, Brothers & Co., upon which, according to the dealings between them, they were entitled to an advance, not exceeding 50 or 60 per cent. of their value. The agreement made by Mr. Forbes with them was, that he should make them remittances, and should procure, if practicable, remittances from persons for whose account the bills were drawn, and also that Baring, Brothers & Co. should withhold advances on the consignments, till the bills they should take up were paid for by the plaintiffs. These bills fell due at various times, and those drawn for account of the defendant came to maturity between the 5th of September and 23d of October. Mr. Forbes remitted, from time to time, as he had or procured funds, upon the bill account generally, and not in reference to the bills of the defendant in particular; meaning to provide for the whole amount of bills, whether exceeding or falling short of £50,000. He had no special reference to any individual bill, so far as appears from any disclosure in the case. And the question is, in regard to the sums remitted, whether the loss sustained by the plaintiffs on these remittances, in consequence of the high rate of premium between the United States and London, shall be apportioned upon all the bills paid by such remittances, or shall be a charge on the bills in the order of time in which they fell due and were taken up.

The question is not free from difficulty; but as the parties appear to have made no special appropriation at the time, we

are called upon to adopt that rule which shall appear to be most equitable and just in regard to those now interested. And on the whole it seems to us, as the agreement was made with Baring, Brothers & Co., that they should pay all the bills whenever they might fall due, without respect to any one set of the exchange more than another, and without regard to the fact whether the bills might be accepted, or protested for non-acceptance, and also without reference to the names of the drawees, and that the remittances were made by Mr. Forbes generally, as funds were obtained, and without special reference to the times when any particular bills fell due ; and considering that they acted with reference to the protection of their own credit and standing, and not under a new contract with the defendant ; we think that the losses, sustained up to the time of the last payment by Baring, Brothers & Co. for account of the defendant's bills, should be assessed equally and ratably upon all the bills paid up to that time, under this agreement ; the amount of such payments and the losses accruing to the plaintiffs to be ascertained by the assessor. And the loss upon a remittance appears to us to be the difference between the value, in specie, of a pound sterling, which value is usually estimated at about 9 to $9\frac{1}{4}$ or $9\frac{1}{2}$ per cent. above the nominal par of exchange, and the current rate of exchange exceeding that value at the time of the remittance. But in regard to this, the assessor will ascertain the true amount.

In regard to the claim for losses alleged by the plaintiffs to have been suffered by them in consequence of the withholding of advances by Baring, Brothers & Co. on the goods consigned, they having retained them as a security for their reimbursement, we think the claim cannot be sustained. The plaintiffs are entitled to recover for the loss directly and necessarily incurred by them in providing for the payment of these bills; but they cannot claim compensation for the loss of those incidental benefits which they might have derived from the use of their money. Speculative damages (sometimes so called) are not favored in law ; and the actual damage, arising

Greene & others v. Goddard.

out of breach of contract for the non-payment of money, is usually measured by the interest of money.   In this case, the alleged damage is, that the plaintiffs could have availed themselves of the high rate of exchange, or of other advantages, if they had not been deprived of the use of the money which was detained from them, and, as they say, through the default of the defendant.   But, viewing the facts in the most favorable light for the plaintiffs, their loss is but suppositive.   In the use of the money, instead of realizing great profits, they might have encountered difficulties and sustained injuries unforeseen at the time, and have suffered, like thousands of others.  Theirs is not a loss, in the just sense of the term, but the deprivation of an opportunity for making money, which might have proved beneficial, or might have been ruinous; and it is of that uncertain character, which is not to be weighed in the even balances of the law, nor to be ascertained by well established rules of computation among merchants.   We are to bear in mind that the property held by the Barings consisted of goods consigned to them by the house in Canton, and that, by the usage between them, the consignees, on the receipt of the goods, and sometimes on receipt of the bills of lading and shipping documents, sent forward remittances to Russell & Co. at Canton, either in specie or bills on India, or in goods, when so directed, to the amount of 50 or 60 per cent. on the value of the respective consignments.   But no evidence is furnished by the plaintiffs, to show that such remittances would have resulted in a profit to them, or that they suffered, in any way, by their being retained.   Nor does it follow that the consignees would have felt authorized to answer the bills of Mr. Forbes, one of the members of the house, to divert the funds to America, without the approbation of the house itself.  And judging from the correspondence, Mr. Forbes himself would have been equally unwilling to make use of those funds here, even should the Barings have consented to charge his drafts to that account ; lest he might injure the standing of his house in India, by diverting money that would be payable to the owners of the goods in cases where the plaintiffs

were merely consignees and not owners. To sustain such a claim as this would be to sanction principles not supported by any decisions with which we are acquainted, and instead of making persons sustain the direct loss arising from their neglect of engagements, it would be to expose them to hazards never contemplated, and to affect them by uncertain speculations in the profits of which they could have no participation, while at the same time they would be made insurers of such profits to their creditors. See *Hayden* v. *Cabot*, 17 Mass. 16C This ground of claim for damages, therefore, on the part of the plaintiffs, must be rejected, and the cause will be sent to an assessor, in accordance with the agreement of the parties, to ascertain the amount of claim for the premiums of exchange on the money they were compelled to advance for the defendant, in consequence of his neglect to provide for the bills as they came to maturity.

[At a subsequent term, judgment was entered for the plaintiffs, for $975·48, and costs.]